# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 16, 2016 Session

## COMMERCE UNION BANK, BRENTWOOD, TENNESSEE D/B/A RELIANT BANK v. KELLY D. BUSH ET AL.

### Appeal from the Chancery Court for Williamson County
### No. 41461     James G. Martin, III, Chancellor

---

### No. M2015-00396-COA-R3-CV – Filed June 29, 2016

---

This is a post-foreclosure action in which the lender seeks to recover a deficiency judgment, interest, and the costs of collection. In their answer, the borrowers asserted that the loan was a nonrecourse debt; thus, they were not liable for the deficiency. Alternatively, they asserted that the property sold at foreclosure for an amount materially less than its fair market value. Following a bench trial, the trial court concluded that the loan was a full recourse debt as to both borrowers. This determination was based on the finding, *inter alia*, that all parties intended the borrowers to be personally liable. The trial court also concluded that the lender was entitled to a deficiency judgment, finding that the borrowers failed to overcome the rebuttable presumption that the foreclosure sale price was equal to the fair market value of the property at the time of the foreclosure sale. *See* Tenn. Code Ann. § 35-5-118. The trial court awarded the lender a judgment of $640,783.41, plus interest and attorney's fees, against the borrowers jointly and severally. As the foregoing indicates, our review is benefited by the trial court's Tenn. R. Civ. P. 52.01 findings of facts and conclusions of law, which disclose the reasoned steps by which the trial court reached its ultimate conclusion and enhance the authority of the trial court's decision. Having reviewed the trial court's findings of fact in accordance with Tenn. R. App. P. 13(d), we have concluded that the evidence does not preponderate against the trial court's findings and that the trial court identified and properly applied the applicable legal principles. For these reasons, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Byron V. Bush, Brentwood, Tennessee, Pro se.

M. Todd Sandahl, Franklin, Tennessee, for the appellant Kelly D. Bush.

Marc T. McNamee and Stephen M. Montgomery, Nashville, Tennessee, for the appellee, Commerce Union Bank, Brentwood, TN d/b/a Reliant Bank.

**OPINION**

In 2006, Byron V. Bush, D.D.S., purchased approximately five acres of unimproved commercial property in Davidson County, Tennessee, located at the southeastern corner of the intersection of Old Hickory Boulevard and Interstate 24, referred to as "StarPointe property" or "StarPointe."

On November 30, 2007, Dr. Bush and his wife, Kelly Bush (collectively "the Bushes"), entered into a Multipurpose Note and Security Agreement (the "Original Note") with Commerce Union Bank, Brentwood, Tennessee, d/b/a Reliant Bank ("Reliant") for the original principal amount of $1,500,000. To secure the Original Note, the Bushes concomitantly executed a deed of trust. Thereafter, the Original Note was renewed on three occasions to defer the due date: January 14, 2010; January 14, 2011; and May 14, 2011.

When the note matured on December 30, 2011, the entire principal balance remained unpaid and outstanding. Thereafter, the Bushes entered into a Forbearance Agreement in which they acknowledged that they were in default in the amount of $1,547,906.26 and waived all claims against Reliant. The agreement temporarily modified their payments due under the note until June 30, 2012, and provided the Bushes an opportunity to either (1) complete a sale of StarPointe prior to the expiration of the forbearance period and pay to Reliant $1,400,000 at closing, or (2) pay Reliant $1,400,000 prior to the expiration of the forbearance period. The Bushes failed to satisfy the requirements under the agreement, and by letter dated July 23, 2012, Reliant declared the note in default, accelerated the entire principal and interest balance, and made a demand for payment in full. When the Bushes did not cure the default, Reliant initiated foreclosure proceedings on StarPointe.

The foreclosure sale was scheduled to occur on September 28, 2012, but was postponed following Dr. Bush's petition for relief under Chapter 13 of the United States Bankruptcy Code, which he filed moments before the foreclosure sale was to begin. The bankruptcy petition was dismissed shortly after it was filed, and the foreclosure sale was rescheduled for December 4, 2012. The Bushes did not attend the foreclosure sale either in person or by representation. Reliant was the only bidder, bidding $1,050,000 based upon the appraisal Reliant ordered from B.G. Jones & Company, LLC prior to the original scheduled foreclosure date that valued the property at $1,050,000, with an effective date of September 19, 2012. Due to the foreclosure being delayed, B.G. Jones & Company, LLC, provided a second appraisal, with an effective date of January 2, 2013, that also valued the property at $1,050,000.

Because the foreclosure sale price did not fully satisfy the amount due under the note, Reliant filed a complaint seeking a deficiency judgment against the Bushes in the amount of $569,706.65, plus interest and costs of collection including attorneys' fees. In their answer, the Bushes alleged that they were not personally liable for the deficiency because the note was a nonrecourse note. They also alleged that StarPointe was sold at foreclosure for an amount "materially less" than its fair market value, which the Bushes claimed was "at least $1.8 million dollars."

During the four-day bench trial, the court heard testimony from the parties including Dr. Bush, Mrs. Bush, DeVan Ard, the president of Reliant, and Rick Belote, the senior vice president of Reliant. Ben Jones, who prepared two appraisals, testified for Reliant, and Eric Boozer, who prepared one appraisal, testified for the Bushes. A third appraiser, Marvin Maes, testified for the Bushes, but he did not appraise the property.

The parties agreed and the trial court found that there were two issues to be decided: (1) whether the note made by the Bushes to the order of Reliant was intended by the parties to be a nonrecourse note; and (2) whether Reliant bid materially less than fair market value for StarPointe at the foreclosure sale.

At the conclusion of the trial, the court entered separate orders addressing each issue, which include extensive findings of fact and conclusions of law. As to the first issue, by Order entered October 14, 2014, the trial found that the loan from Reliant to the Bushes is a full recourse transaction and that they are liable to Reliant for the entire amount of the deficiency. Concerning the foreclosure sale price of StarPointe, by order Memorandum and Order entered October 22, 2014, the trial court found that the Bushes' evidence concerning value did not overcome the presumption afforded Reliant, pursuant to Tenn. Code Ann. § 35-5-118, that the foreclosure sale price equaled the fair market value on the date of the foreclosure sale.

Throughout the trial court proceedings, the Bushes were represented by attorney Todd Sandahl. Immediately following the trial, Dr. Bush dismissed Mr. Sandahl as his attorney, and Mr. Sandahl was granted leave to withdraw from representing Dr. Bush. However, Mr. Sandahl continued to represent Mrs. Bush during the post-trial proceedings and in this appeal. Dr. Bush has represented himself since dismissing Mr. Sandahl.

On October 28, 2015, Reliant filed a Motion for Discretionary Costs, pursuant to Tennessee Rule of Civil Procedure 54.04, and an Application for Award of Attorneys' Fees and Expenses, which was supported by the affidavit of Marc T. McNamee, counsel for Reliant. Reliant requested an award of $106,749.01 for attorneys' fees and expenses, and $6,969.40 for discretionary costs. Dr. Bush filed a response in opposition to the Motion for Discretionary Costs and Attorneys' Fee Application. Mrs. Bush filed a

response in opposition to the Motion for Discretionary Costs but no response in opposition to the Attorneys' Fee Application.

Following a hearing on the motions, the trial court awarded Reliant attorneys' fees and expenses in the amount of $106,749.01 and discretionary costs in the amount of $3,801.90. Dr. and Mrs. Bush each filed a Motion to Alter or Amend. The trial court denied both motions finding that neither party asserted grounds authorizing the court to grant relief.

On January 12, 2015, Dr. Bush filed a pro se Motion for Recusal and Motion for New Jury Trial. The trial court denied the motion for recusal finding it to be untimely filed and not properly supported as required by the Tennessee Supreme Court Rule 10B. The trial court also denied the motion for new jury trial finding that Dr. Bush waived his right to a jury trial by failing to demand a jury in accordance with the requirements of Rule 38 of the Tennessee Rules of Civil Procedure.

Dr. and Mrs. Bush filed separate notices of appeal, separate briefs, and present separate issues for our review, some of which are similar and others are not.

**ISSUES**

For his part, Dr. Bush presents four issues on appeal, which comprise three full pages of his brief and are inundated with argument. For clarity, we restate the issues raised by Dr. Bush as follows: 1) whether the trial court erred by finding that the note made by the Bushes to the order of Reliant was intended by the parties to be a full recourse note as to both Dr. and Mrs. Bush; 2) whether the trial court erred by finding that the foreclosure sale price was not materially less than the fair market value of the property at the time of the foreclosure sale; 3) whether Reliant committed fraud, breach of contract, and lender liability; and 4) whether the trial court erred by denying his recusal motion.

For his third issue, Dr. Bush asks us to consider whether Reliant committed fraud, breach of contract, and lender liability; however, the latter two components are being raised for the first time on appeal. "[I]ssues raised for the first time on appeal are waived." *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996); *see also Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000). Therefore, the issues of breach of contract and lender liability have been waived. As for the issue of fraud, Dr. Bush has preserved the issue of fraud to the extent it pertains to Reliant's engagement of Ben Jones to appraise the property, and its reliance on his appraisal in making its bid to purchase the property at the foreclosure sale.

For his fourth issue, Dr. Bush contends that the trial judge erred by failing to recuse himself; however, he failed to provide citations to authorities and appropriate

references to the record to support his claim of bias as required by Tenn. R. App. P. 27(a)(7). Our courts have consistently held that "the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted). It is not the duty of this court to verify unsupported allegations or search the record for facts in support of an appellant's poorly-argued issues. *See id.* (citing *Duchow v. Whalen*, 872 S.W.2d 692, 693 (Tenn. Ct. App. 1993)). For these reasons, we find this issue waived.[1]

For her part, Mrs. Bush raises nine issues on appeal, which we consolidate and restate as follows: 1) whether the trial court erred by finding that the note made by the Bushes to the order of Reliant was intended by the parties to be a full recourse note as to both Dr. and Mrs. Bush; 2) whether the trial court erred by finding that the foreclosure sale price was not materially less than the fair market value of the property at the time of the foreclosure sale; 3) whether the trial court erred in relying on the appraisal of Ben Jones; 4) whether the trial court erred by failing to "accept best use of property"; 5) whether the trial court erred by considering the sales price of StarPointe after foreclosure; and 6) whether the trial court erred in accepting Reliant's proof of damages.

Regarding issues one and six, Mrs. Bush has failed to provide citations to the authorities and appropriate references to the record to support her claims as required by Tenn. R. App. P. 27(a)(7). As such, we find these issues waived.

For its part, Reliant requests this court to affirm the judgment of the trial court in all respects, hold that Reliant is entitled to an award of attorney's fees on appeal, and remand the case to the trial court for a determination of the reasonable amount of such fees, costs, and expenses.

## ANALYSIS

We turn first to the proper standard of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court following a bench trial, the now-familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005).

---

[1] Furthermore, the record reveals that Dr. Bush did not seek recusal until after the trial court had ruled on all issues following a four-day bench trial, including denying the motion of Dr. Bush to alter or amend the final judgment. Moreover, the trial court correctly denied the motion to recuse as untimely and for failure to comply with Tenn. Sup. Ct. R. 10B.

In cases such as this where the action is "tried upon the facts without a jury," Tenn. R. Civ. P. 52.01 provides that the trial court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.[2] The underlying rationale for the Rule 52.01 mandate is that it facilitates appellate review by "affording a reviewing court a clear understanding of the basis of a trial court's decision," and enhances the authority of the trial court's decision in the absence of findings of fact and conclusions of law, "this court is left to wonder on what basis the court reached its ultimate decision." *In re Estate of Oakley*, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015) (citing *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013)).

Further, compliance with the mandate of Rule 52.01 enhances the authority of the trial court's decision because it affords the reviewing court a clear understanding of the basis of the trial court's reasoning. *MLG Enterprises, LLC, v. Richard Johnson*, No. M2014-01205-COA-R3-CV, 2015 WL 4162722, at *4 (Tenn. Ct. App. July 9, 2015) *perm. app. granted* (Tenn. Dec. 10, 2015); *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. Apr. 29, 2015); *In re Zaylen R.*, No. M2003-00367-COA-R3-JV, 2005 WL 2384703, at *2 (Tenn. Ct. App. Sept. 27, 2005) ("Findings of fact facilitate appellate review, *Kendrick v. Shoemake*, 90 S.W.3d 566, 571 (Tenn. 2002), and enhance the authority of the court's decision by providing an explanation of the trial court's reasoning.").

Our Supreme Court has explained the reasoning for the Rule 52.01 mandate as follows:

> Requiring trial courts to make findings of fact and conclusions of law is generally viewed by courts as serving three purposes. First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." A third function served by the requirement is "to evoke

---

[2] The last sentence of the rule reads: "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6)." Tenn. R. Civ. P. 52.01. It should be additionally noted that whenever a trial court grants a Tenn. R. Civ. P. 41.02 motion for involuntary dismissal, it is required to "find the facts specially and . . . state separately its conclusions of law." Tenn. R. Civ. P. 41.02(2). This requirement parallels the mandate in Tenn. R. Civ. P. 52.01, which applies to all actions tried upon the facts without a jury. *See* Tenn. R. Civ. P. 41.02, 2010 Advisory Comm'n cmt.; *see also* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law . . . .").

care on the part of the trial judge in ascertaining and applying the facts."
Indeed, by clearly expressing the reasons for its decision, the trial court
may well decrease the likelihood of an appeal.

*Lovlace*, 418 S.W.3d at 34-35 (internal citations and footnotes omitted).

There is no bright-line test by which to assess the sufficiency of the trial court's factual findings. Nevertheless, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *In re Estate of Oakley*, 2015 WL 572747, at *10 (quoting *Lovlace*, 418 S.W.3d at 35).

In this case, we have the benefit of comprehensive and detailed findings of fact by the trial court, which fully comply with the Rule 52.01 mandate. We review a trial court's factual findings de novo, accompanied by a presumption of the correctness of the finding of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *see Boarman v. Jaynes*, 109 S.W.3d 286, 289-90 (Tenn. 2003). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We will also give great weight to a trial court's factual findings that rest on determinations of credibility and weight of oral testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000).

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. *Blair v. Brownson*, 197 S.W.3d 681, 683-84 (Tenn. 2006). Accordingly, no presumption of correctness attaches to the trial court's conclusions of law, and our review is de novo. *Id.*

## I. NONRECOURSE NOTE

Dr. Bush contends that the trial court erred in finding that the note was intended by all parties to be a full recourse note. He contends it was a nonrecourse note. In support of this contention, he relies on the fact that he signed the Third Party Agreement paragraph on page three of the Original Note.[3] The Third Party Agreement reads:

---

[3] Mrs. Bush makes the same argument; however, as noted earlier, she failed to provide citations to the authorities and appropriate references to the record to support her claims as required by Tenn. R. App. P. 27(a)(7). As such, she waived the issue. Moreover, Mrs. Bush did not sign the Third Party Agreement paragraph. Therefore, there is no documentation to support the argument that she is not liable on the Note.

I own the Property described in the Security section of this Note and Security Agreement and I agree to give you a security interest in that Property. I am not personally liable for payment of this debt. If the Borrower defaults, my interest in the secured Property may be used to satisfy the Borrower's debt. By signing, I agree to the terms of this Note and Security Agreement and acknowledge receipt of a complete copy of this Loan.

The Original Note was admitted into evidence, and a scanned copy of the signature page, as executed by the parties, appears as follows:

- 8 -

Dr. Bush does not dispute that he is a borrower under the note. He argues, however, that he is not personally liable under the note because the Third Party Agreement paragraph is a "valid and enforceable attached separate rider and provision of the original contractual loan agreement" that he negotiated with Reliant's President, DeVan Ard. Reliant insists that the note was intended by all parties to be a full recourse note. Mr. Ard testified that "all of the communication that the bank had with [Dr.] Bush, the term sheet, the loan approval form, all of the communication was consistent that [Dr. Bush] would be personally liable on the loan." Reliant also insists that Dr. Bush's signature of the Third Party Agreement paragraph was a mistake because it contradicts all other provisions of the note and because a borrower cannot be a third-party to his or her own loan. The outcome of this issue rests on a contractual interpretation of the note between Reliant and the Bushes.

"The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles." *Rainey v. Stansell*, 836 S.W.2d 117, 118-19 (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975)). A primary objective in the construction of a contract is to discover the intention of the parties from a consideration of the whole contract. *Mckay v. Louisville & N. R. Co.*, 182 S.W. 874, 875 (Tenn. 1916). When resolving disputes concerning contract interpretation, we are to ascertain the intention of the parties based upon the "usual, natural, and ordinary meaning" of the contractual language. *Rainey*, 836 S.W.2d at 119. "All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Rainey*, 836 S.W.2d at 118-19).

If the contract language is unambiguous, the written terms control, not the "unexpressed intention of one of the parties." *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). "The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way." *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994) (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.* (quoting *Farmers-Peoples Bank*, 519 S.W.2d at 805). "An ambiguous provision in a contract generally will be construed against the party drafting it." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (citations omitted). When a contract provision is ambiguous, courts can use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. *Id.* In such situations, interpretation is a question of fact. *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 412 (Tenn. Ct. App. 2011).

In the instant case, the trial court specifically found the Original Note ambiguous in terms of the interplay between the language identifying the borrowers and the

borrowers' personal liability and the language contained in the Third Party Agreement paragraph. We agree.

The first page of the note provides: "Borrower: 'I', 'Me' and 'My' Means Each Borrower Below Jointly and Severally," and identifies the borrowers as "BYRON V BUSH, DDS AND KELLY D BUSH." The paragraph immediately following the foregoing provides: "NOTE: For value received, I promise to pay to you, or any other holder, at the address above, the principal sum of: One Million Five Hundred Thousand and 00/100 [$1,500,000.00]." Consistent with their designation on page one as the borrowers, the Bushes also signed as the borrowers on page three of the Original Note where each of them acknowledged that they "understand and agree that my obligation is to pay this loan amount," and that "[t]his obligation is separate and independent of any other person's obligation to pay it." Dr. and Mrs. Bush also agreed that in the event of default, they would pay all reasonable costs incurred by Reliant Bank to collect the note, including attorneys' fees, court costs, and other legal expenses. All of this indicates a clear intent by the parties that the note was to be a full recourse note.

In addition to signing as borrower, Dr. Bush—but not Mrs. Bush—signed the Third Party Agreement paragraph, which identifies him as the owner of the security interest of the note and states that he, Dr. Bush, is not personally liable. Dr. Bush insists that this paragraph is unambiguous and reflects the true intentions of the parties. Essentially, he requests that we ignore all other provisions of the Original Note wherein he and Mrs. Bush are specifically and repeatedly identified as the borrowers under the note with an obligation to pay the loan amount. We decline to do so because "in determining whether or not there is such an ambiguity as calls for interpretation, the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph." *Adkins*, 360 S.W.3d at 412-13.

Accordingly, in construing the language of the Third Party Agreement paragraph in the context of the note as a whole, *see id.*, we can only conclude that the Original Note is susceptible to more than one reasonable interpretation as to Dr. Bush's personal liability, and is, therefore, ambiguous. We therefore affirm the trial court's finding that the language is ambiguous.

If a contract is ambiguous, a court may look beyond the four corners of the document and consider extrinsic parol evidence in order to determine the parties' intention.[4] *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009)

---

[4] To the extent Dr. Bush challenges the admission of extrinsic evidence, although our review of the record indicates this contention is without merit, we will not unduly lengthen this opinion with further discussion of this issue because no objection was made to the introduction of extrinsic evidence at trial. "Failure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence." *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006) (quoting

(continued…)

(citation omitted). Accordingly, we now consider whether the trial court, in construing the Original Note with the help of the parol evidence, arrived at the correct interpretation.

In ruling on the intended liability of the Bushes under the note, the trial court concluded that both Dr. and Mrs. Bush are personally liable to Reliant for the entire amount of the Original Note including interest accrued and attorneys' fees, less the fair market value of StarPointe as of the foreclosure sale date. The trial court's conclusion is based on the finding that the promissory note made by the Bushes to the order of Reliant was *intended by all parties* to be a full recourse note as to both Dr. and Mrs. Bush. In arriving at this conclusion, the trial court's order states that it considered all information presented including the testimony of witnesses at the trial, and all exhibits including but not limited to the Original Note, the Term Sheet, the Loan Application, and the Forbearance Agreement. The trial court also set forth its specific findings of fact and conclusions of law on this issue. The ones that are relevant to this issue read as follows:

> 2. Dr. Bush . . . purchased [StartPointe]. . . for $615,000.00, with a view to developing that property successfully. . . .
>
> . . . .
>
> 5. The Term Sheet is a letter to Dr. and Mrs. Bush from . . . Reliant Bank. . . . The Term Sheet refers to Reliant Bank as the lender and Byron Bush as the borrower, with no guarantor. This is a clear indication that Dr. Bush would be personally liable for the loan in question. On the other hand, if the loan was to be made to a yet-to-be-named business entity, then Dr. Bush and Mrs. Bush would be required to guarantee the loan.
>
> 6. The Term Sheet provides that the loan . . . would not exceed 75% of the appraised value as determined by an independent bank-engaged appraisal.
>
> 7. Reliant Bank obtained an appraisal of the StarPointe property from Donnell Appraisal Services reflecting a value of $2,400,000, which clearly was in excess of the then-contemplated loan amount of $1,500,000 and results in a loan-to-value ratio of less than 75%.
>
> . . . .

---

*Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000)). We further note that Dr. Bush offered his own parol evidence regarding the Original Note, and he does not argue that the court erred in admitting his parol evidence.

10. On November 30, 2007, Dr. and Mrs. Bush signed a Commercial Loan Application. This document reflects that the loan is an individual loan to borrowers Byron V. Bush, DDS and Kelly D. Bush. . . .

11. The Commercial Loan Application was signed by Dr. and Mrs. Bush on November 30, 2007, and reflects that they intended to apply for joint credit. This is further evidence that it was contemplated by Dr. and Mrs. Bush that this loan would be a recourse loan and that they would be responsible for paying the debt when it became due.

12. On November 30, 2007, Dr. and Mrs. Bush signed a Multipurpose Note and Security Agreement (the "Original Note") . . . . The Court characterizes the Original Note as ambiguous at best in terms of the interplay between the language of the document establishing the names of the borrowers and the obligations contained in the Note and the language of the Third Party Agreement paragraph. Because of the ambiguity contained in the Original Note, the Court is authorized to look to collateral parol evidence to resolve that ambiguity.

13. [T]he first page of the Original Note clearly reflects that the borrower includes "I, me, my" and means each borrower jointly and severally. . . .

14. The Original Note reflects that the purposes of the loan were to refinance the Regions Bank loan, provide additional funds to reimburse Dr. and Mrs. Bush for the personal funds that had been used in the project, and provide funds for future site development.

15. The Court finds paragraph 3 on page 2 of the Original Note to be instructive, specifically the portion reading "I understand and agree that my obligation is to pay this loan amount. This obligation is separate and independent of any other person's obligation to pay it."

16. The Original Note provides that in the event of a default, Reliant Bank has the right, without notice, to accelerate the maturity date of the note and require all of the principal, interest and unpaid charges to be due and payable immediately. Dr. and Mrs. Bush also agreed that in the event of default, they would pay all reasonable costs incurred by Reliant Bank to collect the note, including attorneys' fees, court costs, and other legal expenses.

17. Dr. and Mrs. Bush both signed the Original Note as borrowers on page 3. This is consistent with their designation as borrowers on page 1 of the Original Note.

. . . .

19. Dr. and Mrs. Bush are the borrowers under the Note. Accordingly, the Court considers the statement in the Third Party Agreement that Dr. Bush's interest in the secured property may be used to satisfy the borrower's debt "if the borrower defaults" to be a non-sequitur. The Court also considers the last sentence of Third Party Agreement to be redundant. Dr. Bush signed the Original Note and the Deed of Trust. There is no reason for Dr. Bush to separately acknowledge the terms of those documents. Based on the foregoing, there is an ambiguity created within the Original Note . . . .

20. Contemporaneous with the execution of the Original Note, the parties executed the Deed of Trust. The Deed of Trust is instructive to the Court because it reflects that Byron V. Bush, DDS and Kelly D. Bush are the debtors. They are not third parties. They are the makers of the Note. They are the makers of the Deed of Trust. Reliant Bank is the creditor and beneficiary of the Deed of Trust.

. . . .

25. On January 2, 2010, Dr. and Mrs. Bush executed another Commercial Loan Application to renew the Original Note. This Commercial Loan Application reflects that Dr. and Mrs. Bush are the borrowers, individually.

. . . .

28. [Dr.] and Mrs. Bush executed a second Multipurpose Note and Security Agreement dated January 14, 2010 (the "January 2010 Renewal Note"), again reflecting that Dr. and Mrs. Bush are the borrowers.

. . . .

31. [I]t is instructive to the Court that on the January 2010 Renewal Note, Dr. and Mrs. Bush signed as borrowers, and there is no signature under the Third Party Agreement provision.

. . . .

- 13 -

50. [O]n August 19, 2011, Dr. and Mrs. Bush signed another Multipurpose Note and Security Agreement (the "August 2011 Renewal Note") which was dated May 14, 2011.

51. The August 2011 Renewal Note changed the interest rate on the loan . . . . The August 2011 Renewal Note, however, requires that Dr. and Mrs. Bush make six payments of only $2,000, which is approximately one-third of what would have been required if Reliant Bank had demanded all of the interest to which it was entitled on a monthly basis.

52. The purpose of the August 2011 Renewal Note, as clearly stated on page 1, was to extend the maturity date for six months and modify the payment structure and rate. There is no signature here for the Third Party Agreement provision, and Reliant Bank did not print any name under that provision to be signed.

. . . .

55. Dr. Bush consistently has testified that all of the documents that were provided to him by Reliant Bank for signature were provided to him in advance. He also testified that he reviewed those documents and understood them before he went to Reliant Bank and signed them. . . .

56. Dr. and Mrs. Bush went to Reliant Bank on February 28, 2012 and signed the Forbearance Agreement. The Court finds this document to be important in discerning the intent of the parties when the loan was first made and the Original Note was signed. . . .

57. Importantly, Reliant Bank agreed in the Forbearance Agreement that if Dr. and Mrs. Bush would pay the sum of $1,400,000, Reliant Bank would deem Dr. and Mrs. Bush's obligations to be satisfied. This is, in the Court's mind, a serious concession to Dr. and Mrs. Bush, essentially writing off approximately $150,000 in principal and accrued interest.

58. Reliant Bank wanted to be paid the legal fees it incurred to prepare the Forbearance Agreement. Dr. Bush refused to pay those, and that provision in paragraph 9(b) was deleted. Dr. and Mrs. Bush and Mr. Belote initialed that change.

59. Paragraph 15 of the Forbearance Agreement entitled "Final Agreement" was . . . designed to put Dr. and Mrs. Bush on notice that this was the last relief that Reliant Bank would agree to give. . . .

60. On July 23, 2012, Reliant Bank sent a letter to Dr. and Mrs. Bush declaring them to be in default, stating that all obligations under the note were accelerated and demanding payment within five days. Payment was not made.

. . . .

74. Dr. Bush has gone to great lengths to argue to the Court that his understanding with Reliant Bank concerning this obligation was a non-recourse transaction. However, as far as Mrs. Bush is concerned, there is absolutely no evidence in the record that any document she signed would be non-recourse in any way. As far as Mrs. Bush is concerned, the only evidence before the Court is that she is fully responsible for the entire indebtedness under the terms of the Note. As far as Dr. Bush's testimony is concerned regarding the conversations that he allegedly had with various individuals, his testimony is simply not supported by the record, and the Court does not find it to be credible.

All of the evidence in this case except the testimony of Dr. Bush which the trial court found was not credible, supports a finding that Dr. Bush knew that he was personally liable under the note. As noted earlier, we presume that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Further, the trial court's findings are accorded strong deference when they are based on witness testimony, "especially where issues of credibility and weight of oral testimony are involved." *Pierce*, 2008 WL 2557363, at \*6 (quoting *Allstar Consulting Group*, 2007 WL 120046, at \*5.

Considering the evidence in this record, we have concluded that the evidence does not preponderate against the trial court's findings, and we agree with the court's conclusion based upon these findings. We therefore affirm the trial court's holding that the note is a full recourse transaction and that Dr. and Mrs. Bush are both personally liable under the note.

## II. DEFICIENCY JUDGMENT

When a foreclosure sale of real property secured by a deed of trust fails to satisfy an indebtedness, the creditor may recover a "deficiency judgment in an amount sufficient to satisfy fully the indebtedness." Tenn. Code Ann. § 35-5-118(a). This statute, which applies to all trustee or foreclosure sales of real property secured by a deed of trust for which the first foreclosure publication is given on or after September 1, 2010, provides

that, absent fraud, collusion, misconduct, or irregularity in the foreclosure sale, "the deficiency judgment shall be for the total amount of indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale." Tenn. Code Ann. § 35-5-118(b). In such cases, "[t]he creditor shall be entitled to a rebuttable prima facie presumption that the sale price of the property is equal to the fair market value of the property at the time of the sale." *Id.* If a defendant raises inadequacy of the foreclosure price as a defense to the deficiency claim, the defendant "must prove by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale." Tenn. Code Ann. § 35-5-118(c); *see also Lost Mountain Dev. Co. v. King*, No. M2004-02663-COA-R3-CV, 2006 WL 3740791, at *8 (Tenn. Ct. App. Dec. 19, 2006) ("[T]he issue in deficiency actions is the fair market value of the property at the time it was sold.").

Dr. Bush contends that the foreclosure sale process involved fraud, misconduct, or irregularity. According to him, Reliant knew of two appraisals prior to the foreclosure sale and alleges: "it is fraud, misconduct or irregular for [Reliant] to arbitrarily use for their sole benefit the lower and least accurate of two appraisals at foreclosure to determine the Fair Market Value of the highest and Best Use, when questionable appraiser selection protocol was repeatedly used by [Reliant] when only the [Bushes] higher appraisal was currently-zoned and currently appraised at the date of foreclosure sale. . . ."[5] In addition, both Dr. and Mrs. Bush contend the trial court erred by finding that the foreclosure sale price of $1,050,000 was not materially less than the fair market value of the property at the time of the foreclosure sale. We shall first address Dr. Bush's contention that Reliant engaged in "fraud, misconduct or irregularity."

## A. Fraud, Misconduct, or Irregularity

Dr. Bush contends there was fraud, misconduct, or irregularity in connection with the selection of Ben Jones as Reliant's appraiser and that Reliant's decision to use Mr. Jones's appraisal rather than Mr. Boozer's was "arbitrary." Mrs. Bush does not allege fraud but she makes the general assertion that "misconduct exists in the foreclosure process."

---

[5] The issue as stated by Dr. Bush reads:

a. Whether in the presence of two appraisals known by the Plaintiff and their attorneys prior to foreclosure, whose values differ by 46% or $835,000, it is fraud, misconduct or irregular for a Tennessee lending institution to arbitrarily use for their sole benefit the lower and least accurate of two appraisals at foreclosure to determine the Fair Market Value for the Highest and Best Use, when questionable appraiser selection protocol was repeatedly used by Plaintiff and when only the Defendants/Appellant's higher appraisal was currently-zoned and currently appraised at the date of foreclosure sale; and whether the "prima fascia presumption" no longer exists per Tenn. Code Ann. # 35-5-118(b).

In rejecting the argument that Reliant engaged in fraud or misconduct when it selected Mr. Jones to appraise StarPointe, the trial court made the following pertinent findings of fact:

33. [In September 2010, between] . . . the time the January 2010 Renewal Note was signed and its maturity on January 14, 2011, Reliant Bank solicited proposals from appraisers to appraise [StarPointe]. Mr. Ben Jones was the successful bidder. He appraised [StarPointe] and found an "as is" market value of $970,000 and a liquidation value of $680,000. There is no evidence that indicates that Dr. and Mrs. Bush were told about Mr. Jones' appraisal at that time.

34. There was a great deal of effort made on behalf of [Defendants] at trial to establish that there was some sort of collusion between Reliant Bank and Mr. Jones, or that there was some sort of inappropriate procedure that was followed, or that Reliant Bank was remiss in continuing to use Mr. Jones to appraise [StarPointe]. The Court finds that the evidence simply does not establish that conclusion.

35. Based on the consistent testimony of Reliant Bank officers, it is Reliant Bank's policy that the lending officer does not deal with the appraiser. Reliant Bank's procedure in requesting an appraisal is for the lending officer to ask an administrative assistant to obtain an appraisal on the property to be valued. The administrative assistant then sends out a request for proposals to several appraisers. Each appraiser responds and either agrees or does not agree to appraise the property. If the appraiser agrees to appraise the property, the appraiser provides Reliant Bank with his fee and estimated turnaround time.

36. Based upon the needs of Reliant Bank in terms of speed and also the expediency of the case in terms of cost, the lending officer, without knowing who the appraiser is, either approves the low bidder or does not approve the low bidder.

37. Reliant Bank's lending committee annually reviews and approves a list of appraisers. The only inconsistency in the testimony that the Court heard on this issue is whether Reliant Bank's approved appraiser list is a rotating list. There was some testimony that the persons to whom requests for appraisals are sent would be rotated, and that is not consistent. But otherwise, the testimony is very consistent that it is a blind request. The lending officer does not know which appraiser is selected.

- 17 -

38. Mr. Jones appraised [StarPointe] for the first time in September 2010. He then appraised it again in September 2012, just before the proposed foreclosure. Mr. Jones appraised the property in January 2013, within 30 days of the time Reliant Bank purchased the property at foreclosure on December 4, 2012, because bank regulations require the appraisal within 30 days of the time Reliant Bank acquires the property. Mr. Jones appraised the property again in December 2013.

39. The Court finds that the methodology used by Reliant Bank was consistent. It is understandable that the low bid for each appraisal could have come from Mr. Jones because he had appraised the property previously. It would be less expensive for Mr. Jones to bid as a reappraisal, meaning he would simply have to update his prior appraisal as opposed to preparing a brand new appraisal, which would require a higher fee. That may explain why Mr. Jones ended up appraising [StarPointe] four of the six times it has been appraised.

40. The Court also does not find that the relationship between John Souder, who worked for Mr. Jones, and Reliant Bank was inappropriate in any way. Mr. Souder is the son of a friend of one of Reliant Bank's officers. Mr. Souder needed a job and wanted to be in the appraisal field. Mr. Souder's father asked the Reliant Bank officer to let him know if he heard of any available jobs in that field. A referral was made to Mr. Jones' company. The Reliant Bank officer then learned that Mr. Souder had gone to work for Mr. Jones because he got positive feedback about Mr. Souder from Mr. Jones. There is nothing to indicate to the Court that there is any conflict of interest or inappropriate behavior involved the foregoing.

41. The Court finds that the suggestion of Dr. and Mrs. Bush that the Court should not give weight to Mr. Jones' appraisals, which is based on their effort to show that Reliant Bank did not follow proper procedures or engaged in some kind of inappropriate behavior in selecting Mr. Jones, is not supported by the record.

42. The Court also finds that the suggestion that Reliant Bank wanted to influence the value of the appraisal is not supported by the record. . . .

Contrary to the allegations of fraud, misconduct, collusion, or irregularity, the record supports the trial court's finding that Reliant followed proper procedures in selecting an appraiser and that Reliant did not influence the value of the appraisal for which it relied upon in placing its bid at the foreclosure sale.

The trial court also rejected Dr. Bush's allegation that it was "fraud, misconduct or irregular" for Reliant to "arbitrarily use . . . the lower and least accurate of two appraisals at foreclosure to determine the Fair Market Value for the Highest and Best Use," finding as follows:

> [T]he evidence in this case establishes that Mr. Boozer's appraisal was in Dr. Bush's possession, but, of course, there was no way for Reliant Bank to evaluate the appraisal without having a copy in its possession. Reliant Bank also had in its possession its own appraisal performed by Mr. Jones in September 2012 that reflects a market value of $1,050,000. *The fact that Dr. Bush had an appraisal by Mr. Boozer and shared the number with Reliant Bank, without sharing the content of the appraisal with Reliant Bank, is not of much instruction to the Court.* The Court does not place any weight on that part of the evidence.

(Emphasis added).

The record amply supports the trial court's finding, which largely depended upon its findings of credibility, and we give considerable deference to the trial court's credibility findings. *Pierce*, 2008 WL 2557363, at *6 (quoting *Allstar Consulting Group*, 2007 WL 120046, at *5. Despite Dr. Bush's allegations that Reliant "arbitrarily" relied on Mr. Jones's appraisal, the record supports the trial court findings that Reliant was not afforded an opportunity to evaluate the Boozer Appraisal prior to the foreclosure sale because it never received a copy of the appraisal and, as such, was justified in relying on the appraisal in its possession.

Specifically, Rick Belote, Reliant's Senior Vice President, testified that, although Dr. Bush sent an email to Reliant two days prior to the foreclosure sale in which he stated that he had an appraisal estimating a higher value for the property, Dr. Bush did not provide a copy of the Boozer Appraisal. Mr. Belote further testified that the first time he reviewed a copy of the Boozer Appraisal was two weeks before the trial in August 2014. When Dr. Bush was asked whether he provided a copy of the Boozer Appraisal to Reliant prior to the foreclosure sale, Dr. Bush equivocated "I believe so," "I don't know for a fact," and "I thought I did." When asked if he discussed the contents of the Boozer Appraisal with anyone at Reliant prior to the foreclosure sale, Dr. Bush testified that he "did not have direct knowledge that [he] had a discussion with [Reliant] regarding that."

For the foregoing reasons, we find that the evidence does not preponderate against the trial court's finding that there was no fraud, collusion, misconduct, or irregularity in connection with the foreclosure process.

## B. Mr. Jones's Appraisals

Dr. and Mrs. Bush contend the trial court erred by relying on Mr. Jones's appraisals. Both at trial and on appeal, they essentially argue that Mr. Jones's appraisals are not credible because they are untimely, based on an incorrect opinion of highest and best use of StarPointe, and do not consider two letters of interest that Dr. Bush received from a hotel developer.

Notwithstanding these arguments, the trial court found the appraisals by Mr. Jones were credible. The court found that Mr. Jones's supported his opinion concerning the highest and best use for the property with substantial data and analysis. The court further found that Reliant was justified in relying on the appraisal of Mr. Jones whose testimony confirmed that as of the foreclosure sale date, StarPointe had a value of $1,050,000. The court found that it was undisputed that after Reliant acquired the property on December 4, 2012, it listed the property for sale and, by the time of the trial of this case, had reduced the asking price to $870,000. The court also noted that no buyer had been found, and in fact, no offer had ever been received by Reliant for the purchase of the property.[6]

The trial court's findings related to the differing opinions of fair market value and the property's highest and best use are supported by the testimony of the Bushes' own witness, Marvin Maes. Mr. Maes, another appraiser, did not appraise Starpointe himself. Instead, he reviewed the appraisals provided by Mr. Jones and Mr. Boozer, and testified that the appraisals prepared by Mr. Jones and Mr. Boozer were credible. As to the difference in fair market value between the appraisals prepared by Mr. Jones and Mr. Boozer, Mr. Maes attributed the variance to the differing opinions of the property's highest and best use. He testified that two certified appraisers can appraise the same property and come to a different conclusion as to the property's highest and best use, and that the fact two appraisers could come to different conclusions of value does not render either appraisal deficient, as along as the appraisal is credible. Mr. Maes did however testify that he favored the Boozer Appraisal because the property was already zoned for the stated highest and best use.

Concerning Mr. Boozer's opinion of the fair market value of the property, Mr. Maes testified that the $1,885,000 estimate is "the bulk sell-out price, and . . . they

---

[6] Dr. and Mrs. Bush contend that the trial court committed "reversible error" by considering the listed sale price of StarPointe two years after foreclosure as evidence of fair market value. *See Lost Mountain Dev. Co.*, 2006 WL 3740791, at *8 ("[T]he issue in deficiency actions is the fair market value of the property at the time it was sold."). We find no merit to this contention because the trial court's ruling clearly indicates that the only *value evidence* it relied upon was the value opinions of Mr. Jones and Mr. Boozer. In this case, the trial court's consideration of the listed sale price aided the court in its assessment of the appraisals prepared by Mr. Jones and Mr. Boozer.

probably could have gotten that *eventually*." (Emphasis added). Furthermore, when Mr. Maes was informed that Reliant listed the property for sale after it acquired the property on December 4, 2012, and the property was still listed even though the listing price had been reduced to $870,000, and no offer had ever been received by Reliant, "Mr. Maes expressed surprise that the StarPointe property still has not sold, even after it was listed for $870,000."

Despite the foregoing, Dr. and Mrs. Bush contend that Mr. Jones's appraisals with effective dates of September 3, 2012, and January 2, 2013, are untimely and thus not probative of the value of StarPointe at the date of foreclosure, December 4, 2012. We find not merit to this contention because this court has held that appraisals done within weeks of the foreclosure date is sufficient to show the fair market value of the properties at the time of foreclosure. *Halliman v. Heritage Bank*, No. M2014-00244-COA-R3-CV, 2015 WL 1955448, at *5 (Tenn. Ct. App. Apr. 30, 2015) (citing *State of Franklin Bank v. Riggs*, No. E2010-01505-COA-R3-CV, 2011 WL 5090888, at *6 (Tenn. Ct. App. Oct. 27, 2011) (appraisal that provided a range of values for the property shortly before the foreclosure sale and after the foreclosure sale was sufficient evidence to show the fair market value of the property at the time of foreclosure)). Further, Mr. Jones testified that his opinion as to fair market value would not have changed as of the date of the foreclosure sale.

The Bushes also contend that Mr. Jones's appraisals are inaccurate because Mr. Jones did not consider the two letters of interest that Dr. Bush received from a hotel developer. The first letter of intent, dated November 1, 2012, proposed a purchase price of $900,000 for "approximately [two] useable acres" of StarPointe, leaving approximately three acres unsold. It was not accepted and there was no written counteroffer from Dr. Bush. The second letter of intent, dated November 12, 2012, increased the proposed purchase price to $975,000 for "approximately [two] useable acres." Dr. Bush did not accept the second letter of intent; instead, Dr. Bush submitted a counteroffer in a letter he identified as a "Conditional Letter to LOI." The hotel developer did not accept the counteroffer; thus, the parties never agreed upon a letter of intent.

The trial court found that the letters of intent had little weight concerning the value of StarPointe, and the evidence does not preponderate against this finding. Dr. Bush did not accept either letter of intent. Mr. Maes testified that a letter of intent has little value to an appraiser if both parties have not accepted all of its terms and signed it. He further stated that when he prepares an appraisal, he considers the letters of intent as information of interest in the property, but only gives it "50 percent" weight because "whether you get a meeting of the minds or not is probably 50/50 . . . ." In this case, Mr. Maes did not see the letters of intent at issue and Dr. Bush's "Conditional Letter to LOI" until he was testifying at trial. After reviewing them, the trial court asked Mr. Maes: "If you were doing the appraisal and were given these papers . . . , would you conclude that they were of much benefit to you in reaching an opinion of value?" Mr. Maes responded by stating:

- 21 -

"I would say the benefit to me in reaching the opinion of value was that if [Dr.] Bush took this thing, it would knock the value below [$]1,885,000. . . ." Significantly, Mr. Maes went on to explain that Dr. Bush's conditional letter pointed out that what the potential buyer was proposing would create problems for him; specifically, he would have to recreate the site plan for the property, which would materially affect his ability to develop the remainder of the property.

For the foregoing reasons, the evidence does not preponderate against the trial court's finding that Mr. Jones's $1,050,000 valuation of the property was credible.

## C. "Materially Less"

The Bushes also contend the trial court erred in finding the foreclosure price of the property at foreclosure was not "materially less" than fair market value. In support of this contention, they rely on the appraisal of Mr. Boozer and assert that the trial court erred by failing to accept his valuation of StarPointe as "more credible."

Tennessee Code Annotated § 35-5-118 does not provide a definition of the "materially less" standard. *Eastman Credit Union v. Bennett*, No. E2015-01339-COA-R3-CV, 2016 WL 1276275, at *9 (Tenn. Ct. App. Mar. 31, 2016) (citations omitted). Our General Assembly has explained that, "It's a very difficult burden for the debtor to overcome. . . . You have to show a 'strong' difference, a 'material' difference." *Halliman v. Heritage Bank*, No. M2014-00244-COA-R3-CV, 2015 WL 1955448, at *6 (Tenn. Ct. App. Apr. 30, 2015) (citing *GreenBank v. Sterling Ventures, LLC*, No. M2012-01312-COA-R3-CV, 2012 WL 6115015, at *9 (Tenn. Ct. App. Dec. 7, 2012) (quoting Representative Vance Dennis, the Sponsor of HB 3057 in the Tennessee House of Representatives)). In prior cases analyzing this statute, we have refrained from establishing a "bright-line percentage, above or below which the statutory presumption is rebutted." *Eastman Credit Union*, 2016 WL 1276275, at *10 (citing *FirstBank v. Horizon Capital Partners, LLC*, No. E2013-00686-COA-R3-CV, 2014 WL 407908 at *3 (Tenn. Ct. App. Feb. 3, 2014).

The trial court concluded that the Bushes did not overcome the statutory presumption that the foreclosure sale price of StarPointe is equal to the fair market value of the property at the time of the sale. Tenn. Code Ann. § 35-5-118(b). The court's order reads as follows:

> Based on an analysis of the totality of the circumstances, Dr. and Mrs. Bush have not overcome the presumption set forth in T.C.A. § 35-5-118(b). Dr. and Mrs. Bush have not shown that the $1,050,000 paid by Reliant Bank at foreclosure was materially less than fair market value at the time of foreclosure. Even if the Court were to agree with [the Bushes] and conclude that Eric Boozer's opinion of value is superior to the opinion of value

offered by Ben Jones, and accept the result reached by Eric Boozer of fair market value, $1,885,000, based upon the standard set forth in *FirstBank v. Horizon Capital Partners, LLC et al.*, [No. E2013-00686-COA-R3-CV, 2014 WL 407908 (Tenn. Ct. App. Feb. 3, 2014)], the Court would have to presume that the appraisal price set by Eric Boozer was equal to fair market value. As stated by the Court of Appeals in *FirstBank* "such is not the standard." Dr. and Mrs. Bush have offered no credible evidence to establish that the price paid by Reliant Bank at foreclosure on December 4, 2012 was "materially less" than the fair market value of the subject property other than the Boozer appraisal. The unsigned, and unacceptable, letter of intent is of no probative value to the Court just as the lease/purchase agreement was of no probative value to the Court in *FirstBank*.

In this case, the presumptive fair market value of the property is $1,050,000, *see* Tenn. Code Ann. § 35-5-118(b), and this value is corroborated by Mr. Jones's two appraisals of the same value. At trial, the Bushes attempted to rebut the fair-market-value presumption by providing evidence (i.e. the Boozer Appraisal) indicating that StarPointe was worth $1,885,000; however, that evidence was entitled to no more and no less credibility than Mr. Jones's appraisals until the specifics are considered. As previously discussed, the Bushes' own witness, Mr. Maes, opined that all of the appraisals by Mr. Jones and the appraisal by Mr. Boozer were credible. He also acknowledged that competent appraisers often base their appraisals on different uses, meaning highest and best uses. Although Mr. Maes favored the Boozer Appraisal because the property was already zoned for the highest and best use applied by Mr. Boozer, Mr. Maes went on to qualify his assessment of Mr. Boozer's value of StarPointe by stating that the $1,885,000 estimate is "the bulk sell-out price, and . . . they probably could have gotten that *eventually*." (Emphasis added). This statement is significant because evidence of fair market value must be "at the time of foreclosure." *See Capital Bank v. Brock*, No. E2013-01140-COA-R3-CV, 2014 WL 2993844, at *6 (Tenn. Ct. App. June 30, 2014); *Lost Mountain*, 2006 WL 3740791, at *8 ("[T]he issue in deficiency actions is the fair market value of the property at the time it was sold."). Therefore, what the Bushes probably could have gotten *eventually* is inconsequential when the issue is the fair market value at the time of the foreclosure sale. Moreover, the efficacy of the $1,885,000 valuation is undermined by the letters of intent that only pertained to "the approximately [two] useable acres" of the StarPointe property because, as Mr. Maes stated, it "would knock the value below [$]1,885,000. . . ." if Dr. Bush accepted the offer.[7]

---

[7] As Mr. Maes explained, and as Dr. Bush's Conditional Letter to LOI indicated, what the potential buyer was proposing would create problems for Dr. Bush because if he accepted it he would have to recreate the site plan for the property, which would materially affect his ability to develop the remainder of the property.

The trial court found that the evidence presented by the Bushes when considered along with Mr. Jones's appraisals was insufficient to overcome the presumptive value of $1,050,000 established at the foreclosure sale. We find that the evidence does not preponderate against this finding. Thus, the trial court correctly determined that the foreclosure sale price of $1,050,000 was not "materially less" than the fair market value.

## III. ATTORNEY'S FEES ON APPEAL

Reliant asserts that it is entitled to an award of attorney fees on appeal pursuant to the terms of the loan documents. Tennessee follows the American Rule, which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *Chambers v. City of Chattanooga*, 71 S.W.3d 281, 284 (Tenn. Ct. App. 2001) (citing *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing Taylor, 158 S.W.3d at 359; J*ohn Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn.1998)). Having reviewed the pertinent documents, we conclude that an award of attorney fees on appeal was contemplated in the loan documents. Therefore, we remand with instructions for the trial court to award Reliant reasonable and necessary attorney's fees incurred in this appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed equally, and jointly and severally, against Byron and Kelly Bush equally.

_____
FRANK G. CLEMENT, JR., JUDGE